[No. A121002. First Dist., Div. Two. Apr. 20, 2009.]

AUDREY MANUEL et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

928

**COUNSEL**

Blackman Legal Group, Clifford A. Blackman and Jacob Shapiro for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker and Brian R. Thompson for Defendant and Respondent.

**OPINION**

**RICHMAN, J.**—Fourteen-year-old Erika Manuel climbed a transmission tower owned by Pacific Gas and Electric Company (PG&E). Tragically, she came in contact with a live transformer and was severly shocked, suffering serious injuries. She died 11 days later. Erika's parents sued PG&E, which ultimately obtained summary judgment based on the immunity provided by Civil Code section 846. We affirm.

## BACKGROUND

### The Facts

PG&E owns transmission tower 40/195 (the tower), situated on an easement it owns in Lake County. According to pictures in evidence, the tower is

located away from any dwellings or buildings, with a gate seemingly blocking access to it.[1] The tower had attached to it anticlimbing guards, which were triangular shaped pieces of metal. These guards, particularly how they were attached and configured, became the subject of controversy, as discussed in detail below. Likewise in controversy, and likewise discussed below, was whether the tower had any warnings on it.

At approximately 10:00 p.m. to 10:30 p.m. on June 28, 2004, 14-year-old Erika went for a walk with her friend, Antonio Magalhaes. They walked on a trail that started by Erika's home, and they came upon the tower. Erika climbed onto the tower, facilitated, according to Magalhaes, by the anticlimbing guards. At some point in her climb, Erika came in contact with a live transformer, was severly shocked, and fell. Erika suffered burns on approximately 20 percent of her body and severe pulmonary injury from the electrical burn. She died on July 9.

## The Pleadings

On June 28, 2006, Audrey Manuel, Erika's mother, filed a complaint against PG&E. Following PG&E's answer, a first amended complaint was filed, naming as plaintiffs both of Erika's parents, Audrey and Robert Manuel (plaintiffs).[2] It alleged one cause of action, styled negligence and wrongful death.

PG&E's answer included as an affirmative defense that plaintiffs' claims "are barred by the provisions of Section 846 of the California Civil Code." By stipulation, PG&E's answer to the original complaint was deemed responsive to the first amended complaint.

## The Summary Judgment

On September 6, 2007, PG&E moved for summary judgment. The motion was simple and straightforward, with only 11 facts set forth in the separate statement. The motion argued that "[p]laintiffs' claims are barred by Civil

---

[1] There is no evidence in the record pinpointing the exact location of the tower. PG&E's brief says it is in a "remote area of Lake County," but cites only the easement description and photographs in support. Plaintiffs' brief says the tower was "[u]p a hill, and along a trail" which started at Erika's home. However, no distance is set forth. As to the access issue, PG&E says that access to the tower is only if one gets by a locked gate. Again, however, only the pictures are cited in support.

[2] Robert Manuel was named as a defendant in the original complaint pursuant to Code of Civil Procedure section 376. He was named a plaintiff in the amended complaint.

Code section 846, which immunizes the owner of any interest in real property from suit arising out of an injury sustained by a person who uses the property for recreational purposes, is not expressly invited on the property, and does not pay a fee to enter the property."

PG&E's motion was accompanied by three declarations. One was of its counsel, authenticating various deposition excerpts and exhibits. One was of Robert Grimm, authenticating the general location of the tower and the easement. The third was that of Joe Hemstock, the transmission line supervisor for Area 7, where the tower was located. Hemstock had been employed at PG&E since 1971, and at the time of the incident was a senior transmission line specialist, responsible for the maintenance and construction of transmission facilities in Area 7. Among other things, Hemstock testified that "At the time of the incident, transmission tower 40/195 was marked with two warning signs that read:

'DANGER

High Voltage Above

KEEP OFF' "

Plaintiffs' opposition also included three declarations. One was of their counsel, authenticating deposition excerpts, exhibits, and photographs. The others were from two expert witnesses, William P. Adams and Mark A. Rhodes, Ph.D. Mr. Adams's testimony included that at the time of the incident California Public Utilities Commission "General Order 95 Section 61.6-B, entitled Guarding," stated as follows: "Where a tower or structure of a design which can be easily climbed supports supply conductors and is located in urban districts, or in rural areas adjacent to schools, dwellings, permanent or seasonal camps, or in orchards, or near roads or trails which are frequently traveled, a suitable barrier shall be installed on or around such towers and structures, or other provisions shall be made to prevent easy climbing."

Mr. Adams also testified that "General Order 95 Section 61.6 contained a Note which stated in part, 'It is the intent of Rule 61.6-B to require such guarding as will prevent easy climbing of these towers by young persons who do not realize the danger of contact with live conductors supported thereon.' " And, he opined, "The location of Transmission Tower 40/195 would require a suitable barrier to be installed on or around such tower made to prevent easy climbing."

Mr. Adams then testified—testimony echoed by Dr. Rhodes—about defects in the anticlimbing guard assembly, as follows:

"6. Comparing the diagrams and instructions for appropriate construction to the actual assemblies depicted, there are blatant significant differences on tower 40/195.

"7. As indicated by Marking, Numbering, and Identification of Line Structures, 3/31/00, page 25 of 32, Figure 52, anti-climbing guard assemblies should be placed on the horizontal members of the tower. This is to prevent a climber from gaining a handhold, or sturdy foothold, and climbing to a higher level. By contrast, the photographs reveal the assemblies are notably absent from all four horizontal members immediately below the assembly level on tower 40/195."

Both experts also testified that, according to PG&E's diagram for attaching the vertical assemblies, the metal is supposed to point downward such that a climber's hand or foot would contact the slanted edge, the hypotenuse, and slide off. And, they said, on tower 40/195 some vertical assemblies were placed upside down, such that a climber could gain a handhold or foothold by using the flat horizontal edge like steps on a ladder.

Relying on the above expert testimony in conjunction with the deposition testimony of Magalhaes, plaintiffs asserted that Erika was able to grab, and then stand on, the horizontal levels of the assemblies. She used one of the upside down vertical assemblies like a ladder to climb further up the tower, to the live transformer where she was injured.

Plaintiffs' opposition also introduced various excerpts from Magalhaes's deposition concerning warnings on the tower.

His first reference, made apparently voluntarily while testifying about a photograph and about the "spikes," was this: "And that sign wasn't there either. Wasn't there." Then asked about the sign, Magalhaes said, "I don't remember seeing that [sign] that night." After some colloquy between counsel, Magalhaes said, "Yeah, I never seen [sic] that sign."

Finally, there was this exchange, in connection with Magalhaes being asked about a photograph taken by a representative of plaintiffs on June 29, 2004, the day after the incident:

"Q: Do you see the sign that's shown in the picture that Tina Duncan took on June 29, 2004?

"A: You can see it, but you can't read it.

"Q: Have you ever tried to read a sign on the tower?

"A: Yeah, if I could see it; but it's so little. If—only like older people, they would have to be like, 'you kids don't—look at that, look at that little sign, you guys can barely read it, but it says danger, don't climb on this.'

"Q: How do you know it says danger, don't climb on this?

"A: Because you can barely see it. You can't—you can see like 'anger.' You can't even see the 'D'.

"Q: But you know this sign says danger, don't climb on this?

"A: Yeah, I've seen signs before. It says danger, obviously, in the picture.

"Q: It's obvious to you that sign says danger?

"A: Yeah, that's the only thing it would say.

"Q: Okay. Do you recall whether or not you saw a sign—

"A: There was no—

"Q: —the night you were up there?

"A: There was no sign. I didn't see a sign.

"Q: The night you were up there with Erika you did not see a sign, correct?

"A: Yeah.

"Q: You told Erika to stop climbing, but you didn't look for a sign; correct?

"A: When there was—I looked and I didn't see no sign."

Plaintiffs' opposition contained no evidence of any prior incidents at the tower, no evidence that anyone had ever tried to climb it.

The motion was scheduled for hearing on November 21, 2007, before the Honorable John K. Stewart, who had apparently issued a tentative ruling in favor of PG&E. Judge Stewart heard extensive argument, and took the matter under submission. On December 17, 2007, Judge Stewart issued a detailed order granting the motion. We quote much of that order here:

"Exhibit 12, in support of PG&E's motion for summary judgment, depicts the transmission tower in question. This photo, taken on June 29, 2004, the day after the accident, shows anti-climbing guards mounted on the tower strut approximately 12–14 feet above the ground. The photo attached as Exhibit 'H' to plaintiff's opposition to the motion, depicts anti-climbing guards on all vertical struts or members which appear to be about 12 in number. There are no anti-climbing guards on the horizontal members which does not comply with the instructions and diagram shown in Exhibit 'E' attached to Plaintiff's opposition.

"The anti-climbing guards as depicted on one of the vertical members in plaintiff's 'H' are installed upside down so that the top of the triangular guards instead of sloping downward are perpendicular to the strut and provide a level surface. Apparently Plaintiff's decedent was able to place her feet on these guards and climb upwards (Plaintiff's Exhibit A, deposition of Magalhaes). It is not clear how high plaintiff's decedent climbed before she contacted the live power and fell to the ground. Although Plaintiff's expert opines that 'some' assemblies were upside down, only one such strut with improperly installed guards, out of approximately 12, was identified with improperly installed guards in plaintiff's 'H'.

"Exhibit 'H' also plainly depicts two warning signs immediately above the anti-climbing guards on two of the vertical strut [*sic*]. Mr. Magalhaes testified in his deposition, however, that he did not see the signs that night and that 'there [*sic*] were not there.' (Plaintiff's Exhibit A).

"As in *Bacon v. Southern Cal. Edison Co.* (1997) 53 [Cal.App.4th] 854 [62 Cal.Rptr.2d 16], the question here is whether PG&E's immunity under Civil Code [section] 846 was destroyed by willful or malicious conduct. And as in *Bacon*, this Court finds that it was not.

"In *Bacon*, the defendant strung eight strands of barbed wire around the base of its tower, but at the time of the accident, only four strands of wire were in place. Of these four, two were cut or dangling while the others were rusted or loose. Edison also placed a warning sign on the barbed wire but plaintiff contended that at the time of the accident the sign was obstructed by the branches of a bush.

"Nevertheless, the Court found in *Bacon* that based upon these facts, Edison carried its burden of showing that it had placed barbed wire and a warning sign at the tower and that both were present when Bacon climbed the tower. It then became Bacon's burden to show a triable issue of fact on the question of whether Edison so completely failed to maintain the sign and barbed wire that its conduct became willful or malicious. The court held that at most, plaintiff's evidence showed negligence in the maintenance of the tower.

"Here, PG&E has shown that it installed anti-climbing guards on its transmission tower, although the guards were not installed on the four horizontal members and the guards were installed upside down on at least one of the vertical members. As in *Bacon*, this evidence 'was sufficient to show the absence of willful or malicious conduct because [PG&E] attempted to prevent the harm anticipated.' *Bacon, supra*, [53 CalApp.4th at page] 859. Plaintiff's evidence, like that in *Bacon*, shows negligence but it is not enough to overcome Civil Code [section] 846 immunity."

Then, after a discussion of various other cases, Judge Stewart's order concluded with this:

"At most, plaintiff has produced evidence of negligence in installing the anti-climbing guards, and a reasonable juror could find that the warning signs were too small to be visible at night when placed 12 feet to 14 feet above ground, which would also support a claim of negligence. It would be a stretch to say that a reasonable juror, based upon the facts presented, could find that the warning signs were not in place. But even if there was a triable issue of fact concerning the presence of these warning signs, this would not be enough to defeat Civil Code [section] 846 immunity because plaintiff has presented no evidence of willful or malicious conduct."

Judgment was entered for PG&E, from which plaintiffs filed a timely notice of appeal.

## DISCUSSION

### Standard of Review

"Our standard of review is well settled. Under Code of Civil Procedure section 437c, a motion for summary judgment . . . shall be granted if all the papers submitted show there is no triable issue as to any material fact and the

moving party is entitled to judgment as a matter of law. On appeal from an order granting summary adjudication, we exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320 [7 Cal.Rptr.3d 628]; accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94].)

"[W]e must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) Put another way, we exercise our independent judgment to decide whether evidence produced in support of the motion negates plaintiffs' claim. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486–487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) Or, as we said in *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807 [85 Cal.Rptr.2d 459], in affirming a summary judgment for the employer on a FEHA complaint, "We review the evidence presented to the trial court and independently adjudicate its effect as a matter of law. [Citation.]"

It is also true, as plaintiffs remind us, that the motion must be reviewed from a standpoint favorable to plaintiffs. In their words, "The moving party's papers are strictly construed while the opposing party's are liberally construed and any doubt as to whether a triable issue of material fact exists must be resolved in favor of the party opposing the motion. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) Only when the inferences are indisputable may the court decide the issues as a matter of law. . . . An issue of fact becomes one of law only when 'the undisputed facts leave no room for a reasonable difference of opinion.' (*1231 Euclid Homeowners Assn. v. State Farm Fire and Casualty Co.* (2006) 135 Cal.App.4th 1008, 1018 [37 Cal.Rptr.3d 795].)"

Civil Code section 846

Civil Code section 846 (section 846), called the recreational use immunity statute (*Jackson v. Pacific Gas & Electric Co.* (2001) 94 Cal.App.4th 1110, 1114 [114 Cal.Rptr.2d 831]), creates an exception to the general rule that private landowners owe a duty of reasonable care to

persons coming upon their land. (*Bacon v. Southern Cal. Edison Co., supra,* 53 Cal.App.4th at p. 859 (*Bacon*).) The effect of section 846 was summarized by the Supreme Court in *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1099–1100 [17 Cal.Rptr.2d 594, 847 P.2d 560]: "[A]n owner of . . . real property owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give recreational users warning of hazards on the property, unless: (1) the landowner willfully or maliciously fails to guard or warn against a dangerous condition, use, structure or activity; (2) permission to enter for a recreational purpose is granted for a consideration; or (3) the landowner expressly invites rather than merely permits the user to come upon the premises. The landowner's duty to the nonpaying, uninvited recreational user is, in essence, that owed a trespasser under the common law as it existed prior to *Rowland v. Christian* [(1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561]] . . . i.e., absent willful or malicious misconduct the landowner is immune from liability for ordinary negligence. [Citations.]"

In sum, and as Witkin distills it, the effect of section 846 is that an "owner" owes "no duty to keep his or her premises safe or to warn of hazards as to persons entering with permission for 'any recreational purpose.' . . . [¶] Except as provided in [Civil Code section] 846, the owner does not extend assurances that the premises are safe for a recreational purpose, constitute the person 'the legal status of an invitee or licensee to whom a duty of care is owed,' or 'assume responsibility for or incur liability for any injury to person or property caused by any act of such person.' " (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1103, p. 434.)[3]

### Willful or Malicious Failure to Guard or Warn

As indicated from the above, section 846 has three exceptions under which the immunity might be abrogated, only one of which is relied on by plaintiffs here: a "willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity."[4]

---

[3] Section 846 protects owners " 'of any estate or any other interest in real property, whether possessory or nonpossessory,' " and its applicability has been described as "both exceptionally broad and singularly unambiguous." (*Ornelas v. Randolph, supra,* 4 Cal.4th at pp. 1109, fn. 2, 1102.) Thus, the scope of protection provided by section 846 includes easement holders such as PG&E. (See *Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1160 [90 Cal.Rptr.3d 732, 202 P.3d 1115]; *Jackson v. Pacific Gas & Electric Co., supra,* 94 Cal.App.4th at p. 1117; *Colvin v. Southern Cal. Edison Co.* (1987) 194 Cal.App.3d 1306, 1312 [240 Cal.Rptr. 142].)

[4] The other two exceptions are where (1) permission to enter was granted for consideration, and (2) the injury was to a person expressly invited as opposed to merely permitted. (§ 846.) Plaintiffs concede that neither of these exceptions could apply. As their brief puts it, "Erika climbed the tower uninvited for recreation without permission or consideration."

The most exhaustive discussion of the term "willful or malicious failure to guard or warn" is contained in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714 [80 Cal.Rptr.2d 506, 968 P.2d 65] (*Calvillo*), overruled on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]. While the discussion in *Calvillo* was in the context of the immunity in Civil Code section 847, that section contains an exception to immunity in language identical to that in section 846.[5] In *Calvillo* the Supreme Court observed as follows:

■ "While it bears emphasis that legislative use of the term 'willful' may not be precisely the same for all purposes (see generally, *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174 [28 Cal.Rptr.2d 371]), it has been generally recognized in the context of tort liability that the usual meaning assigned to 'willful,' as well as to 'wanton' and to other similar terms, is that ' " 'the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' (Prosser, Law of Torts (4th ed. 1971) § 34, p. 185.)" ' (*New v. Consolidated Rock Products Co.* [(1985) 171 Cal.App.3d 681,] 689 [217 Cal.Rptr. 522], [citation].) One common description of willful misconduct is that it refers to 'intentional wrongful conduct, done either with a knowledge that serious injury to [another] probably will result or with a wanton and reckless disregard of the possible results.' [Citations.] More recently, that same description has been used to define 'willful or wanton misconduct,' a phrase which in turn has been utilized to explain when a failure to guard or warn against a dangerous condition has been 'willful or malicious' for purposes of the recreational use immunity statute codified at section 846. (*Charpentier v. Von Geldern* (1987) 191 Cal.App.3d 101, 113 [236 Cal.Rptr. 233]; *Nazar v. Rodeffer* (1986) 184 Cal.App.3d 546, 552 [229 Cal.Rptr. 209]; *New v. Consolidated Rock Products Co., supra*, 171 Cal.App.3d at p. 689; *O'Shea v. Claude C. Wood Co.* [(1979) 97 Cal.App.3d 903,] 912 [159 Cal.Rptr. 125].)

■ "Though the decisions addressing the issue of liability for willful or wanton behavior vary somewhat in their emphasis, the case law appears relatively uniform on the following points. First, it is generally recognized that willful or wanton misconduct is separate and distinct from negligence,

[5] Civil Code section 847 deals with a landowner's immunity from liability to persons who are injured on property while engaged in certain felonious conduct, limiting liability for injuries "that occur upon the property during or after the injured person's commission of any one of 25 enumerated felonies. ([Civ. Code,] § 847, subds. (a), (b).)" (*Cavillo, supra*, 19 Cal.4th 714, 723, fn. omitted.) However, section 847 "does not limit the liability of an owner . . . which otherwise exists for willful, wanton, or criminal conduct, or for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." (*Id.*, subd. (f).)

involving different principles of liability and different defenses. [Citations.] Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it ' " 'involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences.' " ' [Citations.] So, for example, a person who commits an assault and battery may be guilty of willful misconduct [citations], but a person who fails to perform a statutory duty, without more, is not guilty. [Citations.] While the word 'willful' implies an intent, the intention must relate to the misconduct and not merely to the fact that some act was intentionally done. [Citations.] Thus, even though some cases of negligence may involve intentional actions, the mere intent to do an act which constitutes negligence is not enough to establish willful misconduct. [Citations.]

"Second, willfulness generally is marked by three characteristics: (1) actual or constructive knowledge of the peril to be apprehended; (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) conscious failure to act to avoid the peril. [Citations.] As the foregoing suggests, willful misconduct does not invariably entail a subjective intent to injure. It is sufficient that a reasonable person under the same or similar circumstances would be aware of the highly dangerous character of his or her conduct. [Citations.]" (*Calvillo, supra,* 19 Cal.4th at pp. 728–730.)

Plaintiffs focus on the law set out in the paragraph beginning "Second" above, particularly the three characteristics marking "willfulness." Doing so, plaintiffs place heavy reliance on *New v. Consolidated Rock Products Co., supra,* 171 Cal.App.3d 681 (*New*), which they assert contains the "most thorough review of willful misconduct in the context of Civil Code section 846" and from which plaintiffs quote as some length. But the paragraph immediately preceding that which plaintiffs chose to begin their quotation says, "The concept of wilful misconduct has a well-established, well-defined meaning in California law. 'Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results.' " (*Id.* at p. 689.)

### The Cases Addressing the Willful or Malicious Failure to Guard or Warn Exception to the Immunity in Section 846

There are relatively few published cases dealing with the willful or malicious failure to guard or warn exception to the immunity provided in

section 846. And the significant majority of them have held for the defendant—most on summary judgment. We discuss several of them, beginning with *Bacon, supra*, 53 Cal.App.4th 854, the case heavily relied on by the trial court, and a case which presented a fact pattern that, save for the location of the tower, was eerily similar to that present here. Bacon was a 13-year-old boy who "sustained permanent injuries when he climbed to the top of an electrical transmission tower, received a shock and was knocked to the ground. [Defendant Southern California] Edison owned the tower and the real property under it. The tower is located in a residential neighborhood, near a park and a paved pathway." (*Id.* at p. 857.)

Edison moved for summary judgment based on section 846, and submitted evidence that eight strands of barbed wire had been wound around the base of the tower to guard against climbing, and that a sign had been posted to warn of the danger of climbing. (*Bacon, supra*, 53 Cal.App.4th at p. 857.) Bacon countered with evidence that at the time of the incident "only four strands of barbed wire were strung around the tower. Two of these were cut or dangling, while the others were rusted and loose." And, the plaintiff's argument ran, it was "very easy to get around the wires and climb up the tower." (*Id.* at p. 858.) Bacon also testified that he did not see the warning sign "because it was obstructed by the branches of an adjacent juniper bush." (*Ibid.*) This, Bacon contended, raised a triable issue of fact material to whether Edison engaged in willful or malicious conduct. (*Id.* at p. 859.) The trial court rejected this argument and granted summary judgment.

The Court of Appeal affirmed: "Edison carried its burden by submitting evidence that it had placed barbed wire and a warning sign at the tower and that both were extant when Bacon climbed the tower. This was sufficient to show the absence of willful or malicious conduct because Edison attempted to prevent the harm anticipated. [¶] Bacon then had the burden of showing a triable issue of fact on the question whether Edison failed so completely to maintain the sign and barbed wire that its conduct became willful or malicious. Bacon failed to do so. At most, his evidence showed negligence in the maintenance of the tower. Negligence is insufficient to overcome Civil Code section 846 immunity." (*Bacon, supra*, 53 Cal.App.4th at p. 859.)

*Charpentier v. Von Geldern, supra*, 191 Cal.App.3d 101, cited in *Calvillo*, involved a defendant who owned land bordering the Feather River. The plaintiff entered onto the defendant's property to swim and dive; on his second dive he was injured when he struck his chin and chest on "something soft," either the sandy bottom or something "sandbar like." (*Id.* at p. 106.) The plaintiff sued, alleging that the defendant " 'wilfully and maliciously failed to guard or warn against the dangerous condition of the Feather River in that it was too shallow for swimming and diving and had submerged

objects,' proximately causing [his] injury." (*Id.* at p. 106.) The defendant asserted Civil Code section 846 as an affirmative defense, and ultimately moved for summary judgment, which was granted. The Court of Appeal affirmed, in a discussion which included mention of—and distinction of—one of the few section 846 cases in which the plaintiff prevailed: " 'Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results.' (*O'Shea* v. *Claude C. Wood Co., supra,* 97 Cal.App.3d at p. 912.) . . . [¶] In *Lostritto* v. *Southern Pac. Transportation Co.* [(1977)] 73 Cal.App.3d 737 [140 Cal.Rptr. 905], the plaintiff was injured when he dove from the defendant's trestle into the river below. The court held that the defendant's willful and malicious misconduct could be found when the evidence showed the trestle was near and accessible to a popular swimming area, the practice of swimmers diving from the trestle was of longstanding common knowledge and was a practice of which the defendant was aware, the defendant was informed that swimmers had been hurt diving from its trestle, and the defendant posted no warning signs or failed to erect inexpensive barriers to prevent the practice. (*Id.* at pp. 744–745.) In the present case, defendant submitted declarations and deposition testimony in support of her summary judgment motion in which she established that she had not personally viewed this property and disclaimed any knowledge that the property was used by plaintiff or anyone else for swimming and diving, that use of her property or the bordering river was dangerous, or that any person had ever been injured using her property while diving into the river. She claimed no knowledge of the depths of the river bordering her property and was unaware whether it contained submerged objects. Plaintiff did not dispute these assertions. Defendant further declared that she did not willfully or maliciously fail to guard or warn against a dangerous use of her property." (*Charpentier* v. *Von Geldern, supra,* 191 Cal.App.3d at p. 113.)

Many cases addressing the issue have been decided in the federal courts, most with results not favorable to the plaintiffs. The following are illustrative:

*Mattice* v.˙ *U.S. Dept. of Interior* (9th Cir. 1992) 969 F.2d 818, 822, where the plaintiff drove over a cliff in a national park, on a road on which there had been nine accidents in the prior 10 years. Summary judgment was affirmed, because the risk was obvious and the fact that nine accidents occurred on the road leading to the cliff was insufficient to establish that park employees knew that danger existed, since many of the accidents did not occur near the guardrail, one occurred because of poor brakes, two involved drinking, one involved a distracted driver, and four involved vehicles traveling at excess speeds.

*Coryell v. U.S.* (C.D.Cal. 1994) 855 F.Supp. 1120, 1123, where the plaintiff tripped on a cargo airplane ramp while attending an airshow at a naval air station. The district court held there was no liability absent evidence of an intentional tort by the government.

*Hannon v. U.S.* (E.D.Cal. 1992) 801 F.Supp. 323, 328, where the plaintiff fell into scalding water attempting to rescue his dog in a hot creek area. The district court found no liability even though the United States knew of a potential gap between the fence and water, many people went into the water at cooler areas, and the United States considered and rejected closing the area or increasing patrols. The warnings were specific, and the area was patrolled for noncompliance with park rules.

*Toomey v. U.S.* (E.D.Cal. 1989) 714 F.Supp. 426 (*Toomey*), where the plaintiff motorcyclist was injured when he ran into a fence. Summary judgment was affirmed: "Prior to plaintiff's accident there had been no reported accidents involving the fencing surrounding the [property], and no complaints had been filed regarding the construction, maintenance or failure to warn of the fence's presence. Therefore, defendant did not have actual or constructive knowledge of . . . probable injury." (*Id.* at p. 428.)

*Judd v. United States* (S.D.Cal. 1987) 650 F.Supp. 1503, 1512–1513 (*Judd*), where the plaintiff was injured when he attempted a 35-foot dive from a rock into a small pool near waterfalls in a national forest. There was no liability, despite the fact that the Forest Service knew that persons sunned and swam in the area and dove off of lower rocks. There was no evidence that the Forest Service knew that persons dove from the spot where the plaintiff did.

Plaintiffs have prevailed in a few cases, only one of which is relied on by plaintiffs here: *New, supra,* 171 Cal.App.3d 681. The plaintiffs there were two motorcyclists who drove over a cliff at the end of an abandoned road on the defendant's quarry, property the court described as used by "numerous motorcyclists . . . on a habitual basis." (*Id.* at p. 686.) The plaintiffs produced evidence that "there was but a single earthen barrier in the road, that it was only 12 inches high and 12 inches wide, that it had been constructed to prevent defendant's own large trucks from going over the cliff, and that it was covered with motorcycle tracks, leading cyclists to believe that it was a jump. Plaintiffs also introduced evidence that there were no 'No Trespassing' signs along the road leading to the cliff, nor any other warning signs; that the road was cut in a manner which created the optical illusion that there was no break in the continuity of the road; and that, aside from the foot-high barrier, the road was slick and fast as it proceeded over the cliff." (*Id.* at p. 686.) The plaintiffs further called an expert safety engineer, the essence of whose testimony was "that drivers, including motorcyclists, driving 25 miles an hour

or more, would not be able to read more than three words on a sign, and that if defendant's 'No Trespassing' sign had been in place, motorcyclists would not have read beyond the word 'Quarry.' " (*Id.* at p. 687.)

Another successful plaintiff was in *Lostritto v. Southern Pac. Transportation Co. supra*, 73 Cal.App.3d 737 (*Lostritto*), the case contrasted in *Charpentier v. Von Geldern, supra*, 191 Cal.App.3d 101. In 1972, plaintiff Lostritto dove from a trestle owned by the defendant into shallow water, broke his neck, and was rendered a quadriplegic. Division Three of this court affirmed the plaintiff's verdict, holding as follows: "That the necessary elements of willful misconduct legitimately could be found, as was done by the jury, appears from these facts: the trestle crossed a river near a popular swimming and bathing area; there was easy access from the beaches to the trestle by a stairway; there was a walkway open to the public across the trestle; there was a railing but no real barrier reaching protruding beams which formed a sort of platform from whence plaintiff dived; the practice of diving from the trestle was described by an assistant city attorney as of common knowledge to those who were at the beach, and as having gone on for years; a lifeguard had told a railroad crew about the practice and had received assurance that the word would be passed on, and later that word had gone through proper channels; in about 1961, another lifeguard had told a lawyer at the railroad's San Francisco office that 'people dove and jumped in' from the trestle and in several instances people had been hurt. A roadmaster for the railroad testified at his deposition that when he took charge of the district (in 1973) his track supervisor had told him that 'people normally dive off that bridge,' that 'there is always people diving off of that bridge'; in 1963, a 20-year-old marine dived off the trestle, broke his neck and was killed, and the incident was reported in the Santa Cruz newspaper." (73 Cal.App.3d at pp. 744–745, fn. omitted.)

*Termini v. U.S.* (9th Cir 1992) 963 F.2d 1264 reversed a court trial judgment for defendant. There, the plaintiff was driving on a Forest Service road in a national forest, mistook a spur that forked off the road for the road itself, and plunged over a cliff. Noting that constructive knowledge is " 'measured by an objective standard,' " the court of appeals had "no doubt that a reasonable person standing in the shoes of the United States would have recognized the probability of an accident eventually occurring on the spur as a result of the fact that it leads directly and without warning to a cliff's edge. . . . Further the USFS [(United States Forestry Service)] has bladed and maintained the spur in such a way that a driver can easily mistake it for the main road and venture unwarily down it. . . . [T]he cliff is not visible from the beginning of the spur." (*Id.* at p. 1268.)

The court found support for its conclusion "in the fact that the USFS failed to observe its own safety standards in its maintenance of the spur. . . . [T]he

record clearly indicates that the USFS failed to observe established regulations governing its conduct. The United States' principal expert at trial noted that the Manual on Uniform Traffic Control Devices, published by the United States Department of Transportation and incorporated into the USFS handbook, provides that warning signs should be erected wherever 'hazards are not self-evident' and wherever 'it is deemed necessary to warn traffic of existing or potentially hazardous conditions.' A cliff at the end of a dirt road that is not visible from the beginning of the road would certainly seem to qualify for a warning sign under these guidelines." (*Termini v. U.S., supra,* 963 F.2d at pp. 1268–1269.)

In *Soto v. U.S.* (C.D.Cal. 1990) 748 F.Supp. 727, the plaintiff was injured while diving from a rock ledge into a natural pool. The evidence there included that the Forest Service made no effort to enforce its no-diving ban despite well-documented constructive knowledge that such activity was constantly occurring. (*Id.* at p. 729.)

That, then, is the background against which we review the record here, which review leads to the conclusion that there is no triable issue of fact that PG&E "willful[ly] or malicious[ly] fail[ed] to guard or warn against a dangerous condition, use, structure or activity." (§ 846.)

### PG&E Did Not Willfully or Maliciously Fail to Guard or Warn of a Dangerous Condition

As noted above, cases have held that " '[t]hree essential elements must be present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril. [Citations.]' " (*New, supra,* 171 Cal.App.3d at pp. 689–690; *Calvillo, supra,* 19 Cal.4th at p. 730.) Conceding that the first element is present, PG&E contends that plaintiffs cannot establish either the second or the third element required to elevate PG&E's conduct to the level of willful or malicious. We agree on both counts.

Plaintiffs argue that "PG&E willfully failed to guard the . . . tower and actually created an increased danger by putting the de facto ladder on the tower which enabled Erika . . . to climb it." Specifically turning to the second required element—that injury is a probable result of the danger—plaintiffs assert that "[f]or the chance of injury, the question is not the mathematical probability of a child specifically climbing tower number 40/195 up to the live transformers or whether any had in the past. The question is, under the circumstances, how probable is it that serious injury will result if a child

does. (See *Termini v. U.S.*[, *supra*,] 963 F.2d 1264, 1269.) In the instant case it is extremely likely. This view is consistent with the definition of willful misconduct because it is the probability of serious injury, as opposed to the mere possibility, which makes a failure to act to guard against, or to warn of, a known dangerous peril, wanton and reckless conduct." We are not persuaded.

■  To begin with, plaintiffs' statement that probability is measured simply by "how probable [it is] that serious injury will result if a child does" climb the tower is not supported by any authority. Certainly, *Termini*, the cited case, does not support that proposition, and we can find no California case that does. Indeed, and as PG&E points out, plaintiffs' premise skips "the preliminary question of how probable it is that a child will climb the tower in the first place. Plaintiffs treat the act of a person climbing the tower as a foregone conclusion; however, the likelihood of a person climbing tower 40/195 is relevant to whether PG&E had actual or constructive knowledge that injury was the probable result of the tower as it stood, just as one of the relevant factors in calculating probability is the defendant's knowledge about the frequency of use of the area in question. (*See e.g. Lostritto, supra*, 73 Cal.App.3d at 744–745; *Charpentier, supra*, 191 Cal.App.3d at 113, 114; *Judd, supra*, 650 F.Supp. at 1512.)"

■  Whether PG&E had actual or constructive knowledge that injury was a probable, as opposed to a possible, result of the danger is to be determined "by all of the circumstances." (*Lostritto, supra*, 73 Cal.App.3d at p. 745.) Such circumstances include whether there were prior accidents (*Mattice v. U.S. Dept. of Interior, supra*, 969 F.2d at p. 823; *Toomey, supra*, 714 F.Supp. at p. 428); the defendant's knowledge that persons were engaged in recreational activity at the location (*Lostritto, supra*, 73 Cal.App.3d at pp. 744–745; *Charpentier v. Von Geldern, supra*, 191 Cal.App.3d at pp. 113–114; *Judd, supra*, 650 F.Supp. at p. 1512); and the location of the property itself. Such circumstances could also include ease of access to the danger, as in *Lostritto* where "there was easy access from the beaches to the trestle by a stair-way . . . ," as well as "a walkway open to the public across the trestle." (*Lostritto, supra*, at p. 744.) And such circumstances could include mainte-nance of the property in such a way that it misleads the public, such that the defendant can be charged with knowledge that it is probable someone will encounter the hazard and sustain injury, as in *New, supra*, 171 Cal.App.3d at page 694.

Here, there was no evidence of prior incidents of any kind. No accidents. No prior climbers. And no evidence that anyone frequented the area. More-over, and as plaintiffs' own pictures demonstrate, the tower was apparently in an isolated area. There was, in short, nothing to show that the injury was

"probable," and plaintiffs failed to demonstrate the second required element for willful misconduct. Likewise the third—that PG&E consciously failed to act to avoid the peril.

Plaintiffs assert that "PG&E consciously failed to guard against the peril and increased the danger by facilitating the climb." Such argument falls far short, as plaintiffs' primary authority itself holds: PG&E must have made a "conscious failure to act." (*New, supra*, 171 Cal.App.3d at pp. 689–690.) In the words of the district court in *Hannon*, "The critical issue is whether defendant's alleged failure to act rose to the level of willful or malicious conduct. This is determined by showing a conscious failure to act." (*Hannon v. U.S., supra*, 801 F.Supp. at p. 328.) No such conscious failure to act is shown here. To the contrary.

It was undisputed that PG&E acted to stop climbers by installing the anticlimbing devices. Plaintiffs demonstrated that a few of the devices were apparently installed incorrectly, which, of course, would support a finding of negligence. This is clearly not enough. (*Calvillo, supra*, 19 Cal.4th at p. 729.) The important fact is that PG&E acted "to avoid potential injury and, consequently, did not willfully or maliciously fail to guard or warn against a potentially dangerous condition." (*Toomey, supra*, 714 F.Supp. at p. 428.)

Again, *Bacon* is persuasive. The barbed wire there was designed to prevent people from climbing the tower; apparently some of that barbed wire was neglectfully maintained. The defendant still prevailed, as the negligence was not enough to abrogate the immunity. (*Bacon, supra*, 53 Cal.App.4th at p. 860.) Similarly here. The anticlimbing devices PG&E installed here were designed to thwart climbers. And while there is evidence that some of the devices were apparently installed incorrectly, such negligence is not enough to rise to the level of willful or malicious conduct.

Attempting to distinguish *Bacon*, plaintiffs argue that "Edison's actions did not help Bacon climb the tower," whereas "PG&E's actions helped Erika climb the tower" and thereby "increased the danger." Even so, at best this will support negligence. Again, this is not enough, as *Calvillo* and *New* make clear. "Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it ' " '*involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences.*' " ' " (*Calvillo, supra*, 19 Cal.4th at p. 729, italics added.) Such language is devastating to plaintiffs.

So, too, the language in *New*: " 'Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to

another will probably result, or with a wanton and reckless disregard of the possible results.' " It " ' "differ[s] in quality rather than degree from ordinary lack of care." ' " (*New, supra*, 171 Cal.App.3d at p. 689.) No such conduct is demonstrated here.

Plaintiffs briefly argue that "PG&E willfully failed to warn against the dangerous condition by not placing warning signs on the tower." According to plaintiffs, "The only witness with direct knowledge of what the tower looked like at the time of the incident, Mr. Magalhaes, testified repeatedly that the 'danger high voltage keep off' signs were not there." Then, admitting that pictures taken do show such signs on the tower, plaintiffs assert that "it is disputed as to whether the signs were not there at the time of the incident as Mr. Magalhaes testified, and were only put up afterwards or whether the signs were there all along and Mr. Magalhaes simply did not see them. This is a material disputed fact because if the signs were not there then PG&E did nothing to warn of the dangerous condition. Doing nothing to warn, a conscious failure to act, with knowledge of the peril and the probability of serious injury, constitutes a willful failure to warn."

We agree that there was a disputed fact as to whether there were warning signs. We disagree that such dispute mandates reversal. It does not meet plaintiffs' burden under section 846, demonstrating a willful or malicious failure to guard or warn.

■ "Warn" is defined as: "1. [t]o make aware of potential or probable harm, danger, or evil; caution; . . . 3. [t]o notify (a person) to go or stay away." (American Heritage Dict. (2d college ed. 1982) p. 1363.) So, even if there were no signs, there undeniably were anticlimbing devices. As PG&E colorfully puts it, "Plaintiffs assume warnings only come in the form of signs; but like quills on a porcupine, the jagged metal anti-climbing devices may themselves serve as a warning against climbing the tower."

Moreover, even if there should have been signs, as plaintiffs urge by pointing to the California Public Utilities Commission order and its note, this would not avail plaintiffs, because by itself it would show only negligence, just as the Ninth Circuit noted in *Mattice*: "Mattice argues that the government failed to install steel guardrails, additional reflectors, a sign right before the curve and a permanent shoulder and center line. The government's failure to do those things, at most, would constitute negligence." (*Mattice v. U.S. Dept. of Interior, supra*, 969 F.2d at p. 823.)

## DISPOSITION

The summary judgment is affirmed.

Kline, P. J., and Lambden, J., concurred.