Filed 3/7/14  Monroe v. Yurosek Farms CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JASON MONROE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> YUROSEK FARMS LLC et al., <br><br> Defendants and Respondents. | F066028 <br><br> (Super. Ct. No. CV-271218) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Gibson & Gibson, Edward Gordon and John D. Gibson; Law Offices of Ralph B. Wegis and Ralph B. Wegis for Plaintiffs and Appellants.

Horvitz & Levy, David S. Ettinger and Katherine Perkins Ross; Law Office of Kevin Piekut and Kevin Piekut for Defendants and Respondents.

-ooOoo-

This is an appeal from a judgment of the Superior Court of Kern County entered in favor of defendants and respondents Yurosek Farms, LLC,[1] Yurosek Farming Company, LLC (Yurosek Farming), and Y & Y Management Company, LLC (Y & Y Management), identified en bloc as the Yurosek entities.

Plaintiff and appellant Jason Monroe (Monroe) was driving an all-terrain vehicle (ATV) on real property controlled by the Yurosek entities when he collided with a cable, sustaining multiple injuries. He pled causes of action for negligence, premises liability, and negligent infliction of emotional distress while his wife, plaintiff and appellant Amanda Monroe, pled a cause of action for loss of consortium.[2] The Yurosek entities claimed recreational use immunity under Civil Code section 846.[3] Prior to jury deliberations, the trial court determined as a matter of law that respondents were licensees and issued instructions on recreational use immunity over appellants' objection. Thereafter, the jury pronounced by special verdict that Monroe entered the property for a recreational purpose and the Yurosek entities, while negligent in the use or maintenance of the property, did not willfully or in conscious disregard of the safety of others fail to protect others from the dangerous condition. As respondents were exempt from liability pursuant to section 846, recovery was barred.

Appellants make four contentions on appeal. First, the Yurosek entities admitted in answers to interrogatories that they lacked any interests in the property where Monroe was injured and should not have been allowed to claim recreational use immunity as an affirmative defense. Second, whether respondents held qualifying interests was a

<hr>

[1] In this opinion, "Yurosek Farms, LLC" refers to the limited liability company and "Yurosek Farms" refers to the former sole proprietorship.

[2] Warren Ag Services, Inc., and Imperium Insurance filed a complaint in intervention, but filed a dismissal before the start of trial.

[3] All subsequent statutory citations refer to the Civil Code unless otherwise indicated.

question of fact that should have been determined by the jury. Third, the trial court erroneously excluded relevant evidence. Fourth, the modified special verdict form and the court's clarifying instructions during deliberations improperly suggested to the jury that the willful misconduct exception applied only if respondents subjectively intended to harm Monroe.

We conclude: (1) the Yurosek entities did not admit in answers to interrogatories that they lacked any qualifying property interests; (2) the trial court properly decided as a matter of law that respondents were licensees; (3) the court did not erroneously exclude relevant evidence; and (4) the modified special verdict form and the court's clarifying instructions fairly and clearly stated the standard for the willful misconduct exception. We affirm the judgment.

## **FACTUAL HISTORY**[4]

Jedessa Partners (Jedessa) owned real property in the unincorporated area of Kern County,[5] including a plot of land known as the Tong parcel. In 2005, Jedessa leased five parcels "[to] be used exclusively for the growing of agricultural products" to Yurosek

---

**4** Appellants' 54-page opening brief contains a scant three-page statement of facts that is argumentative and fails to delineate the significant facts, though subsequent portions of the brief recite some facts. "An appellant's opening brief must" "[p]rovide a summary of the significant facts limited to matters in the record." (Cal. Rules of Court, rule 8.204(a)(2)(C); see also *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 113 ["[A]ppellate counsel should be vigilant in providing us with effective assistance in ferreting out all of the operative facts that affect the resolution of issues tendered on appeal. They can accomplish this only by summarizing all of the operative facts, not just those favorable to their clients …."].) Without an adequate statement of facts, we summarize the significant facts in the light most favorable to the judgment. (*In re S.C.* (2006) 138 Cal.App.4th 396, 402.)

**5** Exhibit A of the grant deed provides the following description of the property: "The East half of the East half of Section 31, Township 25 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof. [¶] Excepting therefrom the North 1760 fee thereof."

Farms for a 20-year term. In 2006, the agreement was amended to add two other parcels to the farm. On both occasions, Jeffrey Yurosek (Jeffrey), general partner of Jedessa and sole proprietor of Yurosek Farms, signed as lessor and lessee. Neither the original lease nor the 2006 amended lease mentioned the Tong parcel. Jedessa and Yurosek Farms "inadvertently left off Tong on the description of property as part of the lease," "intend[ed] to include Tong as part of the property falling within that lease," and "treated [Tong] as being part of the lease" until November 1, 2008.[6] Prior to June 2008, Yurosek Farms planted avocados and pomegranates in the Tong parcel and paid rent.[7]

In 2008, Jeffrey converted Yurosek Farms into three limited liability companies: Yurosek Farms, LLC, Yurosek Farming, and Y & Y Management.[8] These entities comprised a "single enterprise consisting of farming, harvesting, and selling crop." Yurosek Farms, LLC, received and shipped orders. Yurosek Farming leased and improved the property that made up the farm. Regarding the Tong parcel, it planted crops and installed an underground irrigation system. Y & Y Management managed the property and procured equipment. Jeffrey was the sole owner of Yurosek Farms, LLC, and Yurosek Farming and majority owner of Y & Y Management. He personally oversaw the operations of the enterprise. Jeffrey hired David Yurosek (David), his cousin, to serve as farm manager for the period of November 2007 to November 2008. David supervised Filiberto Carranza, the foreman.

---

[6] On November 1, 2008, the lease was amended to include the Tong parcel and change the lessee from Yurosek Farms to Yurosek Farming.

[7] Starting June 2008, Yurosek Farming paid rent. Until the lease was amended on November 1, 2008 (*ante*, at fn. 6), Jedessa treated Yurosek Farming as the lessee.

[8] Articles of organization were filed for Y & Y Management on January 18, 2008, and for Yurosek Farms, LLC, and Yurosek Farming on June 25, 2008. (See former Corp. Code, § 17050, subd. (c), added by Stats. 1994, ch. 1200, § 27 and repealed by Stats. 2012, ch. 419, § 19 ["The existence of a limited liability company begins upon the filing of the articles of organization."].)

In or around February 2008, Jeffrey installed pipe gates and cable gates[9] on the farm, including the Tong parcel, to deter trespassing, theft, and vandalism.[10] He hired Demetrio Garcia, who built the pipe gates and erected and painted the posts for the cable gates. Carranza and his crew connected the cables and attached 10 to 12 strands of flagging tape to each cable. All the gates were completed before September 1, 2008.

Jeffrey was aware that the cables were difficult to see and had them marked with flagging tape to improve their visibility and reduce the risk of collision. Because the tape could fade after a few months or be blown off by the wind, he and his workers carried extra tape and replaced any faded or missing strands they came across. In addition, wooden pallets flanked each cable gate and displayed "No Hunting" and "No Trespassing" signs.

Two days before the opening of dove season on September 1, 2008, David and Carranza inspected each cable gate and ensured each cable was marked with flagging tape. On September 1, 2008, at or around 7:00 a.m., they again inspected each cable gate and ensured each cable was still marked. Sometime after 9:00 a.m., Monroe, a manager at Warren Farms, and two coworkers drove ATV's in the vicinity and examined various objects, including pistachio bushes, a boat, horse statues, a steamer trunk, a "burnt-out" car, and the body of a deceased dog. While they were passing through the Tong parcel en route to the reservoir and "Mr. Yurosek's new shop," Monroe collided with an unmarked cable.[11] The impact severed his left fingers, ruptured his left femoral artery, and broke his left femur.

---

**9**     Whereas a pipe gate could swing open, a cable gate consisted of a cable fastened to two posts and stretched across a roadway.

**10**     Jeffrey and David specified that hunters entered the farm and tended to shoot "at anything" out of frustration, including wells and electrical panels.

**11**     At the time of the accident, other cables in the area were still marked with flagging tape.

## DISCUSSION

I. __Summary of California's Recreational Use Immunity Statute.__

In general, a property owner owes a duty of reasonable care to any person coming upon the land. (See § 1714; *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1099 (*Ornelas*).) Section 846, however, provides the following immunity:

> "An owner of any estate or any other interest in real property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose, except as provided in this section. [¶] A 'recreational purpose,' as used in this section, includes such activities as … riding, including animal riding, snowmobiling, and all other types of vehicular riding, … sightseeing, ... nature study, nature contacting, … and viewing or enjoying historical, archaeological, scenic, natural, or scientific sites."

Two elements must be established as a precondition for recreational use immunity. First, the defendant must be the owner of an estate or any other possessory or nonpossessory interest in real property. Second, the plaintiff's injury must result from the entry or use of the premises for any recreational purpose.[12] (*Ornelas*, *supra*, at p. 1100.)

a. *Qualifying property interests*

Section 846 presents an "'exceptionally broad and singularly unambiguous' definition of protected property 'interests.'" (*Miller v. Weitzen* (2005) 133 Cal.App.4th 732, 736 (*Miller*), quoting *Ornelas*, *supra*, 4 Cal.4th at pp. 1102-1103; accord *Hubbard v. Brown* (1990) 50 Cal.3d 189, 192 (*Hubbard*).) As originally enacted, section 846 only exempted from liability "'owner[s] of any estate in real property.'" (*Hubbard*, *supra*, at p. 194, quoting Stats. 1963, ch. 1759, § 1, p. 3511.) The Third Appellate District then ruled in *Darr v. Lone Star Industries, Inc*. (1979) 94 Cal.App.3d 895 and *O'Shea v.*

---

**12**     Monroe does not dispute on appeal that he entered the Tong property for a recreational purpose.

*Claude C. Wood Co.* (1979) 97 Cal.App.3d 903 that the statute only immunized holders of possessory interests in real property. (*Hubbard*, *supra*, at p. 194.) In 1980, however, the California State Legislature amended section 846 by inserting the phrases "'or any other interest'" and "'whether possessory or nonpossessory'" into the opening sentence, thus "remov[ing] the *Darr* and *O'Shea* limitations" and "immuniz[ing] the owner of *any* interest in real property regardless of whether the interest includes the right of exclusive possession." (*Hubbard*, *supra*, at pp. 194, 195, original italics.) For instance, a license, which confers only "'a personal, revocable and unassignable permission to do one or more acts on the land of another without possessing any interest therein'" (*Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 637; accord *San Jose Parking, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1321, 1329), constitutes a qualifying interest under section 846 (see *Hubbard*, *supra*, at pp. 194-197). Independent contractors, on the other hand, who "work[] on the property of another in the interest of that other or the party in control of the premises" and "may be entitled to be present on the property during such time as the work is being performed" are merely business invitees and cannot invoke recreational use immunity. (*Jenson v. Kenneth I. Mullen Inc.* (1989) 211 Cal.App.3d 653, 658 (*Jenson*).)

   b. *The willful misconduct exception*

Section 846 "does not limit the liability which otherwise exists … for willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." Regarding the phrase "willful or malicious," the First Appellate District detailed:

> "'[I]t has been generally recognized in the context of tort liability that the usual meaning assigned to "willful," as well as to "wanton" and to other similar terms, is that """"the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." [Citation.]'" [Citations.] One common description of willful misconduct is that it refers to "intentional

7.

wrongful conduct, done either with a knowledge that serious injury to [another] probably will result or with a wanton and reckless disregard of the possible results." [Citations.] More recently, that same description has been used to define "willful or wanton misconduct," a phrase which in turn has been utilized to explain when a failure to guard or warn against a dangerous condition has been "willful or malicious" for purposes of the recreational use immunity statute codified at section 846. [Citations.]'" (*Manuel v. Pacific Gas & Electric Co.* (2009) 173 Cal.App.4th 927, 939 (*Manuel*).)

"'Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it ""'involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences."'" [Citations.]'" (*Id.* at p. 940.)

"'[W]illfulness generally is marked by three characteristics: (1) actual or constructive knowledge of the peril to be apprehended; (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger; and (3) conscious failure to act to avoid the peril. [Citations.]'" (*Manuel*, *supra*, 173 Cal.App.4th at p. 940.) Willful misconduct "'does not invariably entail a subjective intent to injure. It is sufficient that a reasonable person under the same or similar circumstances would be aware of the highly dangerous character of his or her conduct. [Citations.]'" (*Ibid.*)

II. **The Yurosek entities did not admit in answers to interrogatories that they lacked any qualifying property interests in the Tong parcel.**

a. *Background*

i. *Answers of Yurosek Farms, LLC, to certain interrogatories*

Intervenors (*ante*, at fn. 2) propounded to Yurosek Farms, LLC, the following special interrogatories dated October 13, 2011:

8.

"[Special Interrogatory No. 6:] [¶] Do **YOU** contend that on September 1, 2008, you had a property interest in the **PROPERTY** on which the **INCIDENT** of the subject litigation occurred?"

"[Special Interrogatory No. 12:] [¶] On September 1, 2008, what was the nature of your activities and/or responsibilities on the **PROPERTY** on which the **INCIDENT** of the subject litigation occurred?"[13]

In a response dated November 14, 2011, respondent objected to Special Interrogatory No. 6 on the basis that the phrase "'property interest'" was "vague, ambiguous and overly broad." It objected to Special Interrogatory No. 12 on the grounds that the question was compound and the phrase "'nature of your activities and/or responsibilities'" was "vague, ambiguous and overly broad," but stated "[w]ithout waiving the foregoing objections":

> "Technically speaking, responding party had no role with respect to the approximate 105 acre lot that included the scene of plaintiff's accident, but the answer is not that simple. Before Yurosek Farms, LLC, officially existed, it entered into an agricultural lease with Jedessa Partners, LP, under the name 'Yurosek Farms.' Said lease was in existence at the time of plaintiff's accident and included the 105 acre lot. *The lease agreement does not include the legal for the 105 acre parcel at issue, but it was intended to be and the property has been treated as if it was included in the lease.* Furthermore, Jeff[rey] A. Yurosek is the sole member of Yurosek Farming Company, LLC, the sole member of Yurosek Farms, LLC, managing member of Y&Y Management Company, LLC and general partner of Jedessa Partners, LP. The Yurosek entities and their activities/responsibilities are intertwined by virtue of Jeffrey A. Yurosek's involvement in said entities."

---

**13** The intervenors provided the following definitions:

> "(a) **INCIDENT** includes the circumstances and events surrounding the alleged accident, injury, or other occurrence by Jason Monroe on September 1, 2008. [¶] (b) **YOU** includes you, your agents, your employees, your insurance companies, their agents, their employees, your attorneys, your accountants, your investigators, and anyone else acting on your behalf. [¶] … [¶] (f) **PROPERTY** means that real property adjacent to Peterson Road on which the cable gate Jason Monroe impacted with an ATV on September 1, 2008 is located."

On November 21, 2011, Richard Kern, representing intervenors, sent an e-mail to Kevin Piekut, representing the Yurosek entities. Kern detailed that Special Interrogatory No. 6 was propounded "in response to the affirmative defense raised by each of the [] defendants in which they cite … section 846 as a basis for immunity under the recreational use statute" and designed to elicit "whether the defendants have a 'property interest' in the real property so as to enjoy the benefits of the immunity …." Regarding the objections to the phrase "'property interest,'" he pointed out that section 846 immunized owners of "'any estate or any other interest in real property, whether possessory or nonpossessory'" and quoted language in *Miller*, *supra*, 133 Cal.App.4th 732, holding the definition of "'property interest'" to be "'exceptionally broad and singularly unambiguous' …." Kern warned that "failure to respond with an answer that can be used to discover the defendants['] actual possessory or nonpossessory interest is not appropriate …." On November 22, 2011, Piekut replied, "One of the problems was how the term 'property interest' was being used. I see from your email that it is being used in the strict legal sense, in terms of ownership or possessory rights…."

In a supplemental response dated December 5, 2011, Yurosek Farms, LLC, answered regarding Special Interrogatory No. 6, "Assuming that 'property interest' means ownership or possessory interest, the answer is no." Regarding Special Interrogatory No. 12, it replied, "This entity is simply engaged in the sales of product which may or may not have come from the property. It also does shelling, but it has nothing what[so]ever to do with the ownership, control or operation of the subject parcel except in the sense that what it sells may (or may not) have come from there."

ii. *Answers of Yurosek Farming to certain interrogatories*

Appellants propounded to Yurosek Farming the following special interrogatory:[14]

---

[14] The record shows the date of the interrogatory as March 19, 2012.

> "[Special Interrogatory No. 4:] Identify any [writings you] contend give Yurosek Farming Company, LLC ownership of an estate or other interest in the land where the accident occurred as of September 1, 2008."

In a response dated November 27, 2011, respondent objected to the interrogatory on the basis that the phrase "'or other ownership interest'" was vague and ambiguous and, "[w]ithout waiving said objection, ... identif[ied] the January 1, 2005, Agricultural Lease between Jedessa Partners and 'Yurosek Farms'" as proof of an interest in the Tong parcel. It explained, "Before Yurosek Farming Company LLC officially existed, said lease was entered into under the name 'Yurosek Farms.'"

Intervenors propounded to Yurosek Farming the following special interrogatories dated October 13, 2011:

> "[Special Interrogatory No. 6:] [¶] Do **YOU** contend that on September 1, 2008, you had a property interest in the **PROPERTY** on which the **INCIDENT** of the subject litigation occurred?"

> "[Special Interrogatory No. 11:] [¶] If **YOU** contend that on September 1, 2008, you did not have a property interest in **THE PROPERTY** on which the **INCIDENT** of the subject litigation occurred, identify the nature of your relationship to the subject property."

In a response dated November 14, 2011, respondent objected to the interrogatories on the basis that the phrase "'property interest'" was "vague, ambiguous and overly broad." Following receipt of Kern's e-mail (*ante*, at pp. 10-11), it provided a supplemental response dated December 3, 2011. Regarding Special Interrogatory No. 6, Yurosek Farming answered, "Assuming by 'property interest' you mean ownership or possessory interest, the answer is no," Regarding Special Interrogatory No. 11, it stated:

> "Yurosek Farming Company LLC did not form until November 2008. Because this entity did not exist on September 1, 2008, it could not have possibly had any such interests. Once it was formed, the agricultural lease with Jedessa Partners was amended to substitute the name of 'Yurosek Farming Company LLC' for 'Yurosek Farms,' which was a sole proprietorship owned solely by Jeffrey Yurosek. Because Yurosek

11.

Farming Company LLC did not exist on September 1, 2008, it is not an appropriate party to this suit." (Contra, *ante*, at fn. 8.)

### iii. *Answers of Y & Y Management to certain interrogatories*

Appellants propounded to Y & Y Management the following special interrogatory dated October 11, 2011:

> "[Special Interrogatory No. 4:] Identify by name, address, and telephone number the custodian of any such [writings you] contend give David Yurosek ownership of an estate or other interest in the land where the accident occurred as of September 1, 2008."

In a response dated November 22, 2011, respondent objected to the interrogatory on the basis that the phrase "'or other interest'" was vague and ambiguous and, "[w]ithout waiving said objection," specified that it "did not have an ownership interest in the property" and "[i]ts interest was the management of the property."

Intervenors propounded to Y & Y Management the following special interrogatory dated October 13, 2011:

> "[Special Interrogatory No. 6:] [¶] Do **YOU** contend that on September 1, 2008, you had a property interest in the **PROPERTY** on which the **INCIDENT** of the subject litigation occurred?"

In a response dated November 14, 2011, respondent objected to Special Interrogatory No. 6 on the basis that the phrase "'property interest'" was "vague, ambiguous and overly broad." Following receipt of Kern's e-mail (*ante*, at pp. 10-11), it stated in a supplemental response dated December 3, 2011, "Assuming that 'property interest' means ownership or possessory interest, the answer is no." In an amended response dated March 26, 2012, Y & Y Management explained:

> "Assuming that 'property interest' means ownership or possessory interest, the answer is no. However, as has been stated previously, Y&Y Management, L.L.C. manages the various farm properties, including the parcel in question. While its status as a farm management company does not give it ownership or possession rights to the property, it does, as a matter of law, create a license to use, manage and/or cross-over the subject

property in furtherance of its role in the agricultural production taking place there."

> iv. *Appellants' requests to the trial court to treat respondents' answers to certain interrogatories as disclaimers of any interests in the Tong parcel*

On December 1, 2011, appellants moved for judgment on the pleadings and asked for an order "precluding [the Yurosek entities] from relying on [the recreational immunity defense provided by section 846] as they do not own any estate or any other interest in the real property where this accident occurred." On December 13, 2011, appellants requested, pursuant to Evidence Code sections 452 and 453, "judicial notice of admissions … [made by the defendants in] answers to interrogatories," namely those of Yurosek Farms, LLC, to intervenors' Special Interrogatories Nos. 6 and 12, Yurosek Farming to intervenors' Special Interrogatories Nos. 6 and 11, and Y &Y Management to intervenors' Special Interrogatory No. 6.[15] On December 27, 2011, following a hearing, the trial court denied the request for judicial notice and the motion for judgment on the pleadings.

On July 16, 2012, appellants moved in limine "[f]or an order preventing evidence, testimony and/or argument concerning recreational immunity from (1) any defendant having previously denied ownership of an estate or other interest in the real property where the accident occurred and (2) any defendant failing to prove such ownership." They reiterated that respondents admitted in answers to certain interrogatories (*ante*, at pp. 9-13) "that they do not own any … interest in the land where the accident occurred." On July 30, 2012, the court denied the motion without prejudice:

---

**15** The grounds for a motion for judgment on the pleadings must appear on the face of the challenged pleading or from matters that may be judicially noticed. (Code Civ. Proc., § 438, subd. (d); *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 & fn. 5.)

"I think it's a motion that pretries issues in the case…. I don't think I can prerule on that without hearing the evidence and the testimony regarding the role that these defendants play with respect to the property and the role they play with respect to the owner or any predecessors in interest…. [¶] … [¶]

"… [I]f [defendants] were on the property and they strung the cable, the issue is: What authority did they have to be on the property? And I don't know that I can determine that without hearing the full testimony on the relationship of the parties. Were they acting as an agent of the owner? Were they acting as a possessor? Do they have some sort of lease interest? These are all -- this goes to the recreational immunity defense. And so these are issues that the defense is going to have to prove. And the defense may be impeached by whatever they said in their interrogatory responses. That may very well be the case. And then I may end up -- after hearing all that, I may end up having to make a legal determination before it goes to the jury on any type of motion that might obtain [*sic*] to the affirmative defense. But I just don't think I can rule on that as the matter is now presented to me. [¶] … [¶]

"If someone gets on the witness stand and contradicts a statement made in deposition or by interrogatory, then they can be impeached with the discovery. This is -- it's somewhat different if there is a request for admission, because that -- a request for admission goes to the legal question, but what you're presenting to me is interrogatory responses, and then we get into the issue of what was meant by interest in property, what do they understand interest in property to mean…."

On August 20, 2012, appellants submitted a trial brief arguing the Yurosek entities' answers to intervenors' Special Interrogatory No. 6 constituted admissions that they lacked any qualifying interests and such admissions were "conclusive and binding" and "preclude[d] any recreational immunity defense as a matter of law." The court remarked:

"I'm comfortable with the fact that I can make the ruling on this legal question upon the state of the evidence; and if the contention interrogatory is as stated by the plaintiff, I can deal with the issue on any motions that might be made with respect to the evidence in connection with the contention interrogatory. I'm going to take the evidence and deal with it in that fashion."

14.

On August 22, 2012, before jury deliberations, the court "denied … the plaintiffs' motion on the preclusive effect of the defendants' answers to the intervenor[s'] three interrogatories" because the answers "were not sufficiently conflicting with the trial testimony or the entire scope of the discovery responses" and the interrogatories "did not refer to the nonpossessory rights."

b. *Analysis*

The parties do not dispute the words offered in response to the aforementioned interrogatories. Appellants maintain, however, that these words must be interpreted as admissions by the Yurosek entities that they lacked any property interests in the Tong parcel, thus precluding recreational use immunity. We review de novo the legal significance of these words (cf. *In re Alanna A.* (2005) 135 Cal.App.4th 555, 562) and reject appellants' argument.[16] First, the answers of Yurosek Farms, LLC, to intervenors' Special Interrogatories Nos. 6 and 12 indicated it did not own the Tong parcel or retain a possessory interest, but was nonetheless permitted by Jedessa to sell the harvested crops,

---

[16]    To the extent appellants contend the trial court should have taken judicial notice of respondents' answers to interrogatories, we find no abuse of discretion. (See *Washington v. County of Contra Costa* (1995) 38 Cal.App.4th 890, 901 [judicial notice under Evid. Code, §§ 452 and 453 reviewed for abuse of discretion]; see also *Willis v. State of California* (1994) 22 Cal.App.4th 287, 291 ["'[T]he decision of the judge not to take judicial notice will be upheld on appeal unless the reviewing court determines that the party furnished information to the judge that was so persuasive that no reasonable judge would have refused to take judicial notice of the matter.[']"].)

To the extent appellants contend the trial court should have granted its motions to preclude all evidence, testimony, and argument concerning recreational use immunity on the basis that respondents "admitted" that they lacked any property interests in the Tong parcel, we find no abuse of discretion. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 (*Shaw*) ["We review a trial court's evidentiary rulings for abuse of discretion."]; *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 530, quoting *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 640 ["'The trial court's "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered."'"].)

implicating a *profit à prendre*.  (See *Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1186 ["A *profit à prendre* has been defined as the 'right to make some use of the soil of another, … and it carries with it the right of entry and the right to remove and take from the land the designated products or profit and also includes right to use such of the surface as is necessary and convenient for exercise of the profit.'"].)  Second, the answers of Yurosek Farming to appellants' Special Interrogatory No. 4 and intervenors' Special Interrogatories Nos. 6 and 11, read in conjunction rather than in isolation, did not deny a nonpossessory interest.  Finally, the answers of Y & Y Management to appellants' Special Interrogatory No. 4 and intervenors' Special Interrogatory No. 6 specified that Jedessa conferred on it a license to enter, use, and manage the Tong parcel.  Appellants' assertion that Kern's e-mail to Piekut on November 21, 2011, somehow converted respondents' answers into disclaimers of any property interests is unpersuasive in view of Piekut's reply, which evinced his understanding that "'property interest'" was confined to "'ownership or possessory rights,'" and respondents' use of the modifying phrase "Assuming that 'property interest' means ownership or possessory interest" in subsequent answers.

Appellants believe the facts of this case parallel those of *Universal Underwriters Ins. Co. v. Superior Court* (1967) 250 Cal.App.2d 722 and *Estate of Luke* (1987) 194 Cal.App.3d 1006.  We disagree.  In the first case, Universal Underwriters (Universal) issued to Lynch Motors a policy "insuring the persons covered therein against liability incurred through the ownership and use of certain automobiles" and requiring Universal to "defend any actions brought against its insured to establish liability within the terms of the policy."  (*Universal Underwriters Insurance Co. v. Superior Court*, *supra*, at pp. 724-725.)  The driver of a vehicle owned by Lynch Motors was involved in an accident and Pacific Indemnity Group (Pacific), the driver's insurance company, sought indemnity.  (*Id.* at p. 725.)  Universal claimed the policy did not extend coverage to the driver

because an endorsement to the policy limited its liability. (*Ibid.*) Pacific propounded to Universal the following interrogatories:

> "[Interrogatory No. 4]: 'Do you contend that there was legal consideration passing from your company to the insured [Lynch Motors] for the endorsement …?' … [Interrogatory No. 5]: 'Do you contend that no legal consideration was necessary in order for the aforesaid endorsement … to be valid?'" (*Id.* at pp. 725-726.)

Universal answered "'No'" to Interrogatory No. 4 and "'Yes'" to Interrogatory No. 5. (*Id.* at pp. 725-726.) Because Universal "did not contend that there was any legal consideration passing from [it] to Lynch Motors for the endorsement[]" and "contend[ed] that no legal consideration was necessary in order to make the endorsement effective," the court found "no issue as to the matter involved remained to be determined at the time of trial, and no further discovery was necessary." (*Id.* at p. 729.)

In the second case, the decedent died intestate in 1984, six years after his wife. (*Estate of Luke*, *supra*, 194 Cal.App.3d at p. 1010.) The wife's heirs wanted to share in the decedent's estate and had to trace his assets to the couple's community property. (*Id.* at pp. 1012, 1019.) They propounded to the decedent's heirs the following interrogatories:

> "'Do you contend that at any time between the date of marriage of decedent and his predeceased wife and the date of decedent's death that he received any real or personal property by way of gift, devise, bequest or descent? [¶] ... [¶] … Do you contend that any assets owned by the decedent at the time of his death had a source other than joint tenancy assets owned by his predeceased wife and himself at the time of her death, plus accumulations thereon? [¶] ... [¶] … Do you contend that any of the real or personal property in which the decedent and his predeceased wife owned any interest in at the time of the death of his predeceased wife was acquired by gift, devise, bequest or descent, excluding forty acres of Iowa farm land in the name of the predeceased wife?'" (*Id.* at pp. 1020-1021.)

The decedent's heirs answered "'Not at the present time'" to each interrogatory. (*Id.* at pp. 1020-1021.) The court determined the decedent's heirs "did *not* contend [the

17.

decedent]'s estate had a source other than the assets owned by [the couple]" and therefore "no issue as to the source of the assets in [the decedent]'s estate remained to be determined at the hearing." (*Ibid.*, original italics.)

Whereas the succinct answers of the responding parties in *Universal Underwriters* and *Estate of Luke* set a triable issue at rest, those of respondents in the instant case did not.[17]

III. **The trial court properly found as a matter of law that the Yurosek entities were licensees.**

a. *Background*

Prior to jury deliberations, the trial court decided the issue of whether the Yurosek entities held qualifying property interests:

> "I had reviewed *Hubbard vs. Brown* …. I've reviewed other cases or read them: the *Ornelas vs. Randolph* case and the *Jensen* [*sic*] case. And I came to the conclusion that the evidence is sufficient to meet the statutory terms of Section 846 that … the defendants at a minimum have a license as a matter of law upon the premises involved in the case, which allows the giving of the [CACI No. 1010] instruction."

The court then rejected appellants' requests for two special instructions, titled "Pre-Condition to Affirmative Defense—Recreation Immunity" and "No Recreational Immunity Under Civil Code § 846 For Agents or Business Invitees" (boldface omitted), respectively:

> "I think it is incongruous for the Court to decide the issue as a matter of law and then have the jury essentially nullify the underlying basis for the

---

**17**    Our ruling on this issue renders moot appellants' ancillary contention that respondents' "admissions" were binding. As an aside, we point out that appellants cite *Universal Underwriters Ins. Co. v. Superior Court*, *supra*, 250 Cal.App.2d 722 and *Coy v. Superior Court* (1962) 58 Cal.2d 210 for the proposition that answers to interrogatories are conclusively binding, but immediately concede that these cases "were decided before revisions to the discovery act which allowed amendments to discovery answers without leave of court."

affirmative defense, so I won't give those instructions. Again, I state the jury, of course, makes the decision whether the defense applies to the facts. That's my decision on that."

b. *Analysis*

An issue of law must be decided by the trial court. (Code Civ. Proc., § 591; Evid. Code, § 310, subd. (a); see also *Lysick v. Walcom* (1968) 258 Cal.App.2d 136, 158, citing *Huebotter v. Follett* (1946) 27 Cal.2d 765, 770 ["It [is] error … to submit to the jury as a question of fact an issue that on the record was one of law."].) Where the evidence bearing on the issue is undisputed and permits only one reasonable conclusion, the issue is one of law for the court to resolve. (See *Curcic v. Nelson Display Co.* (1937) 19 Cal.App.2d 46, 53; see also *People v. Great American Ins. Co.* (1963) 222 Cal.App.2d 552, 554-555 [where facts essential to the determination of a legal issue are not in dispute, a trial court's determination as to the issue is a conclusion of law and not binding on an appellate court].)

We conclude the trial court properly found as a matter of law that the Yurosek entities were licensees.[18] As previously stated, a license is "'a personal, revocable and unassignable permission to do one or more acts on the land of another without possessing any interest therein'" (*Beckett v. City of Paris Dry Goods Co.*, *supra*, 14 Cal.2d at p. 637.) "'The one essential of a license is that it be assented to by the licensor; and *any acts* may serve to show such assent.'" (*Eastman v. Piper* (1924) 68 Cal.App. 554, 560, italics added.) "'The consent from which a license arises may be manifested … in the use of language, or in conduct other than the use of language. Such conduct may consist of acts indicative of a consent by the actor to the use of his land by another, or it may consist in failure to take reasonable action when inaction may reasonably lead to an inference of consent.'" (*Zellers v. State of California* (1955) 134 Cal.App.2d 270, 273.)

---

[18] Accordingly, the court properly refused to give appellants' requested instructions on this issue.

Here, while none of the Yurosek entities held a leasehold estate in the Tong parcel until November 1, 2008 (*ante*, at fn. 6), they improved, farmed, harvested, managed, and profited from the property with Jedessa's knowledge and consent.

Appellants counter that the Yurosek entities were business invitees akin to the defendants in *Jenson*, *supra*, 211 Cal.App.3d 653. We disagree. In *Jenson*, the landowner hired the defendants to excavate and perform percolation tests on his property in contemplation of development. While the plaintiff was driving a motorcycle on the landowner's property, he crashed into an excavation. (*Id.* at pp. 655-656.) In determining the defendants did not have an interest that triggered recreational use immunity under section 846, the court emphasized that the agreement between the landowner and the defendants did not confer a privilege on defendants. Instead, "the import of the contract in this regard was simply to give defendants permission to enter and be on [the landowner]'s property solely for the purpose of performing their contractual obligation, i.e., perform percolation tests, which included excavating the subject hole, for the sole benefit of [the landowner]." (*Jenson, supra,* at p. 657.) By contrast, respondents were not hired to perform manual labor on the Tong parcel for the sole benefit of Jedessa: they utilized and protected the property in furtherance of their own enterprise.

IV. **The trial court did not erroneously exclude relevant evidence.**

    a. *Background*

        i. *Respondents' objections to questions regarding Jeffrey's and Carranza's conduct following Monroe's accident*

On examination of Jeffrey as an adverse witness,[19] Ralph Wegis, representing appellants, asked:

---

**19**    "A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any

> "Q. Sir, when you talked to Filiberto [Carranza] and learned of the accident, had you already been told by [David] or anybody else about the seriousness of the injuries?
>
> "A. I don't recall, sir.
>
> "Q. Now, when you talked to Filiberto, how long after the accident did you understand that occurred? How long after the accident did you get your phone call?
>
> "A. I don't recall that either. I'm sorry.
>
> "Q. Now, did you tell him -- let me back up here. [¶] Am I remembering correctly? You don't remember whether he said anything about there not being any flags on the cable at that time or did he?
>
> "A. He said when he got to the accident site later there was [*sic*] no flags. I believe that's what he told me, either him or David.
>
> "Q. Now, given that information, did you tell him to right then go check every other gate and make sure that it had flags on it before he went home?"

Piekut objected to the question on the basis of relevance. The trial court sustained the objection. Immediately thereafter, Wegis asked:

> "Q. Now, did you ever -- after you looked at the accident site with no flags, did you go check every other cable gate on the ranch to make sure it had flags on it?"

Piekut again objected on the basis of relevance. The court sustained the objection.

### ii. *Respondents' objection to Garcia's unsigned declaration and handwritten remarks*

Wegis proffered an unsigned declaration dated May 2011 that was given to Demetrio Garcia (see *ante*, at p. 5). The declaration read:

---

time during the presentation of evidence by the party calling the witness." (Evid. Code, § 776, subd. (a).)

"I[,] Demetrio Garcia[,] hereby declare the following: [¶] Jeff Yurosek contracted me to install cables in several sites throughout the property of Yurosek Farms …. [¶] On each of the wires I put reflectors to signal and thereby making it possible to visibly see the cables. [¶] After installing the cables it depended on the owner if he wanted to leave those reflectors to signal."

Garcia did not sign the document and wrote the following remarks on March 16, 2012:

"I don't know anything of what is written above. I did not put the cables when we started to work. It was told to one that we were dealing about job with that if wanted we would put the cables of steel he said no they were putting them on."

Wegis made the following offer of proof:

"I think the foundation that we have so far is from [Robert Gonzalez, a licensed private investigator], where he indicated that he spoke with Mr. Piekut; that he received this declaration from Mr. Piekut. He translated it to Spanish and assigned somebody to go out and get it signed and it wasn't signed. [¶] Now, what is at issue here is the credibility of the Yuroseks, and the Yurosek position is that 'We maintained flags on cable gates at all times.' In fact, it was to the extent that we all carried rolls of tape in our car to do it. [¶] Now, with regard to Mr. Garcia, he is presented with a document prepared by the defendants, their agents, delivered by their agents and asked to execute that document under penalty of perjury. And he found it something that he could not do because he indicated it was, in fact, not true that he had done that."

Piekut objected to the evidence on the basis that it lacked foundation, inter alia.

The trial court excluded the unsigned declaration and handwritten remarks:

"The issue here is whether the presentation of the declaration is probative evidence in the case. I would agree with you [Wegis] if it was done by Mr. Yurosek or somebody was going to him [Garcia] and saying, 'Hey, will you testify that you did X, that you put reflectors and flags on it,' and he said, 'No, I won't do that,' that would go potentially to the credibility of the party, but that hasn't been established. This came from the lawyers, and I don't think you can attach the lawyers' efforts to litigate the case to their client. I don't think you can do that. [¶] … [¶] … I would have no problem with your argument if … Mr. Yurosek had directly hired Mr. [Gonzalez] and said, 'Hey, go see if you can get Mr. Garcia to sign this. It'll protect us in the litigation if he's willing to do that.' There's no

22.

evidence of this. [¶] The evidence is, as you said, we learned it apparently for the first time from the witness stand from Mr. [Gonzalez] that this came from Mr. Piekut. That's the problem. That's where it becomes a problem. To introduce this as evidence on the issue of credibility for the Yurosek parties, it can't come in for that purpose because there's no foundation that they had anything to do with it. In other words, I view this as you're sweeping with too broad a brush."

b. *Analysis*

"We review a trial court's evidentiary rulings for abuse of discretion." (See *Shaw*, *supra*, 170 Cal.App.4th at p. 281; see also *People v. Tafoya* (2007) 42 Cal.4th 147, 165 [a trial court's ruling on the sufficiency of foundational evidence is reviewed for abuse of discretion].) "Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.] There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. [Citation.] A trial court will abuse its discretion by action that is arbitrary or '"that transgresses the confines of the applicable principles of law."'" (*Shaw*, *supra*, at p. 281.)

First, we conclude the trial court did not abuse its discretion when it sustained respondents' relevancy objections to questions regarding whether Jeffrey or Carranza checked and made sure other cable gates were marked with flagging tape after Monroe's accident. The court could reasonably infer from the appearance of these questions that Wegis sought to elicit testimony that either Jeffrey or Carranza took subsequent remedial measures. Such evidence would have been inadmissible to prove culpable conduct and therefore irrelevant. (See Evid. Code, § 1151; see also *Ault v. International Harvester Co.* (1974) 13 Cal.3d 113, 118, fn. 3 [the phrase "culpable conduct" in Evid. Code, § 1151 encompasses wanton and reckless misconduct and other faulty conduct besides negligence].) Furthermore, when these objections were raised and sustained, Wegis did not explain the relevance of these questions even though circumstances indicated the

23.

court was likely unaware of another material purpose. (See *People v. Coleman* (1970) 8 Cal.App.3d 722, 730-731.)[20]

Second, we conclude the trial court did not abuse its discretion when it sustained respondents' lack-of-foundation objection to Garcia's unsigned declaration and handwritten remarks. "Relevant evidence includes evidence relevant to the credibility of a witness." "Whether or not evidence tendered to affect the credibility of a witness is admissible depends on a preliminary ruling by the trial court that such evidence would be sufficient to sustain a finding that the witness' credibility is, indeed, affected thereby." (*Granville v. Parsons* (1968) 259 Cal.App.2d 298, 304, citing Evid. Code, §§ 210, 403.) Here, Wegis proffered Garcia's unsigned declaration and handwritten remarks for the purpose of impugning the Yurosek entities' credibility, explaining Piekut, their agent, attempted to procure false testimony. The court expressed reasonable reluctance to admit purported evidence of Piekut's misconduct in litigation as evidence relevant to respondents' credibility. Attorneys retained to conduct litigation in the courts are independent contractors and "'not subject to the control and direction of their employer over the details and manner of their performance.'" (*Channel Lumber Co. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1229.) In view of the latitude afforded to attorneys over their work, the trial court justifiably required preliminary facts showing the Yurosek entities directly endorsed the alleged misconduct before it would admit the unsigned declaration and handwritten remarks. Absent this showing, it excluded these items.[21]

---

[20] Appellants argue in their reply brief that Wegis made an offer of proof that prior deposition testimony of Carranza and David indicated they did not check the gates after the accident on the day in question. Contentions raised for the first time in the reply brief are generally not entertained. (See *Scott v. CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 322.) In any event, the offer of proof does not provide further insight into the relevancy of the questions to which Piekut objected.

[21] Because we find the trial court did not erroneously exclude relevant evidence, we need not address appellants' arguments concerning prejudicial error.

24.

V.  **The modified special verdict form and the trial court's clarifying instructions during jury deliberations fairly and clearly stated the standard for the willful misconduct exception.**

    a. *Background*

        i. *The modified special verdict form*

The trial court prepared CACI No. VF-1001 (Premises Liability—Affirmative Defense—Recreation Immunity). Question No. 7 of this special verdict form originally read, "Did Yurosek Farms, LLC knowingly fail to protect others from the dangerous structure?" Respondents asked the court to modify Question No. 7 by replacing "knowingly" with language that mirrored either section 846 or Special Jury Instruction Nos. 6 and 7 (at p. 27, *post*). Appellants deemed the revision unnecessary. The court sided with respondents:

> "I agree that [Question No.] 7 when it says 'knowingly' does not adequately state the requirements of the statute. I would change [Question No.] 7 to say, 'Did any defendant willfully or in conscious disregard of the safety of others fail to protect others from the dangerous condition?' And I think that appropriately sets forth the requirements of the statute. [¶] … [¶] … 'Willfully or in conscious disregard of the safety of others,' which is essentially the definition of 'maliciously' that's contained in the statute."

Thereafter, Question No. 7 of the modified special verdict form read, "Did any defendant willfully or in conscious disregard of the safety of others fail to protect others from the dangerous condition?"

        ii. *Jury instructions*

The court issued CACI No. 1010 (Affirmative Defense—Recreation Immunity (Civ. Code, § 846)):

> "The defendants are not responsible for Jason Monroe's harm if the defendants prove that Jason Monroe's harm resulted from his entry on or use of defendants' property for a recreational purpose unless Jason Monroe proves all of the following: One, that any defendant knew or should have known of the condition that created an unreasonable risk of serious injury; two, that defendant knew or should have known that someone would probably be seriously injured by the dangerous condition; and, three, that

25.

defendant knowingly failed to protect others from the dangerous condition."

The court then issued Special Jury Instruction No. 6 (Willful Misconduct):

"Willful misconduct is intentional wrongful conduct done either with knowledge, express or implied, that serious injury to another will probably result or with a conscious disregard of such probable result. [¶] An intent to injure is not a necessary element of willful misconduct. To prove misconduct, it is not necessary to establish that the defendant recognized its conduct as dangerous. It is sufficient if it be established that a reasonable man under the same or similar circumstances would be aware of the dangerous character of such conduct."

Last, the court issued Special Jury Instruction No. 7 (Recreational Immunity Exceptions):

"If a defendant either willfully or with conscious disregard of the safety of others fails to guard or warn against a dangerous condition upon its land, a plaintiff who is injured as a proximate result of such failure is entitled to recover compensation for such injury from the defendant. Thus, the plaintiff is entitled to a verdict in this case if you find in accordance with any instructions, one, that the defendant willfully or with a conscious disregard of the safety of others failed to guard or warn against a dangerous condition upon its land with knowledge, express or implied, that serious injury to another would probably result; and, two, that such failure was a proximate cause of injury to the plaintiff. [¶] As previously stated, a person acts with conscious disregard for safety of others when he is aware of the probable dangerous consequences of his conduct and willfully and deliberately fails to avoid those consequences."[22]

### iii. *The jury's request for clarification*

The jury asked the court for clarification of the phrases "'willfully or in conscious disregard'" in the special verdict form and "'willfully and deliberately'" in Special Jury Instruction No. 7. Wegis requested "very, very clear guidance" from the court that "'[c]onscious disregard['] … does not require an intent to injure[]" and proposed that the

---

**22** The record shows appellants proposed Special Jury Instruction Nos. 6 and 7. Before jury deliberations, when Piekut did not object to either instruction, Wegis withdrew Special Jury Instruction No. 7. The court then granted Piekut's request for that instruction.

parties be given an opportunity to brief the issue. The court determined that "th[e] matter is resolved by the instructions that the jury already has." It subsequently advised the jury:

> "The first thing I want to tell you is that the words 'willfully and deliberately' in [Special Jury Instruction No. 7] mean the same thing. That there's no distinct -- 'deliberately' is 'willfully' and 'willfully' is 'deliberately.' It's just a conjunction that's used to mean the same thing.

> "As far as any other clarification you need, I believe that that's contained … in the instructions you've already received …. '"Willfully" means willful misconduct. And willful misconduct is intentional wrongful conduct done either with knowledge, express or implied, that serious injury to another will probably result or with a conscious disregard of such probable results. An intent to injure is not a necessary element of willful misconduct.' So please consult that instruction if you have any further question.

> "The issue of 'conscious disregard' and the definition of 'conscious disregard' is set forth in [Special Jury Instruction No. 7]. 'A person acts with conscious disregard for the safety of others when he is aware of the probable dangerous consequences of his conduct and willfully' -- and in this case it says 'deliberately,' which means the same thing -- 'fails to avoid those consequences.'"

b. *Analysis*

Appellants claim the trial court's instruction that "willfully" and "deliberately" in Special Jury Instruction No. 7 were identical in meaning compelled the jury to read Question No. 7 of the modified special verdict form as follows: "'Did any defendant deliberately or with a conscious disregard of the safety of others fail to protect others from the dangerous condition?'" This, in turn, led the jury to believe that the willful misconduct exception applied only if the Yurosek entities possessed a subjective intent to harm Monroe. We must address this argument piecemeal.

We review de novo the correctness of the modified special verdict form. (See *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.) To the extent appellants assert the revised Question No. 7 containing the phrase "willfully or in conscious disregard of the

27.

safety of others" was improper, we disagree. A special verdict is "that by which the jury finds the facts only, leaving the judgment to the Court." (Code Civ. Proc., § 624.) It must present conclusions of fact in such a manner that "nothing shall remain to the Court but to draw from them conclusions of law." (*Ibid.*) Question No. 7 of the special verdict form originally asked whether respondents "knowingly" failed to protect others from the dangerous condition. (See *ante*, at p. 26.) In view of *Manuel*, *supra*, 173 Cal.App.4th 927, this iteration did not accurately reflect the standard for the willful misconduct exception. (Cf. Cal. Rules of Court, rule 2.1050(b) ["The Judicial Council endorses these instructions for use and makes every effort to ensure that they accurately state existing law. The articulation and interpretation of California law, however, remains within the purview of the Legislature and the courts of review."].) *Manuel* defined willful misconduct as ""intentional wrongful conduct, done *either* with a knowledge that serious injury to [another] probably will result *or* with a wanton and reckless disregard of the possible results." [Citations.]" (*Manuel*, *supra*, at p. 939, italics added.) In other words, willful misconduct """involves a more positive intent actually to harm another *or* to do an act with a positive, active and absolute disregard of its consequences."" [Citations.]" (*Id.* at p. 940, italics added.) The revised Question No. 7, which encompassed the *Manuel* test, was more accurate.[23] (Cf. Cal. Rules of Court, rule 2.1050(e) ["[I]t is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors."].)

Next, we review de novo the propriety of the jury instructions. (See *Miller*, *supra*, 133 Cal.App.4th at p. 736, fn. 3.) "'Instructions must be considered in their entirety, and, if, as so considered, they state the law of the case fairly and clearly, then they are, as a

---

[23]    We also note the revised Question No. 7 mirrored language found in Special Jury Instruction No. 7. (See *ante*, at p. 27.)

28.

whole, unobjectionable, even though by selecting isolated passages of single instructions they may in some respects be amenable to just criticism.'" (*Eagar v. McDonnell Douglas Corp.* (1973) 32 Cal.App.3d 116, 120; see also *Hom v. Clark* (1963) 221 Cal.App.2d 622, 643 ["The instructions must be considered together and as a whole, because '[s]emantic analysis of a single line, sentence or instruction without regard to the whole charge can only result in misleading distortion.'"].) We recognize that the term "deliberately," which was mentioned once in Special Jury Instruction No. 7, cannot be found in pertinent statutory or case authority. Nevertheless, we find the instructions, as a whole, fairly and clearly stated the standard for the willful misconduct exception.

Finally, we review the court's clarifying instructions during deliberations for abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) "After the jury ha[s] retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into Court. Upon their being brought into Court, the information required must be given in the presence of, or after notice to, the parties or counsel." (Code Civ. Proc., § 614; cf. Pen. Code, § 1138.) Here, in response to the jury's request for guidance, the trial court first advised that "willfully" and "deliberately" in Special Jury Instruction No. 7 were synonymous. We consider the harmonizing of these terms to be a sensible attempt to preserve instructional uniformity.[24] The court also reread portions of Special Jury Instruction Nos. 6 and 7 to reiterate: (1) willful misconduct is performed "either with knowledge, express or implied, that serious injury to another will probably result or with a conscious disregard of such probable results"; (2) willful misconduct does not require a specific intent to

---

[24] We point out, moreover, that appellants initially proposed Special Jury Instruction No. 7 and "deliberately." (*Ante*, at fn. 22.) Consequently, we are reluctant to criticize the court's manner for dealing with a possible semantic discrepancy that appellants themselves prompted.

injure someone; and (3) the phrase "'conscious disregard for the safety of others'" describes one's awareness of the probable dangerous consequences of his conduct and willful failure to avoid those consequences. "[N]o error arises from a court's choice to reread instructions in response to jury requests for further information, so long as the original instructions themselves do not constitute incorrect statements of law." (*Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1136-1137; cf. *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1219-1220.)

We do not conclude the jury was led to believe that the willful misconduct exception applied only if the Yurosek entities possessed a subjective intent to harm Monroe.

## DISPOSITION

The judgment of the superior court is affirmed. Costs on appeal are awarded to respondents.

_____
DETJEN, J.

WE CONCUR:


_____
CORNELL, Acting P.J.



_____
HOFF, J.*

---

*     Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.